THOMPSON-McLEAN, INC. v. P. L. CAMPBELL.

(Filed 26 February 1964.)

**1. Brokers and Factors § 6—**

In order to be entitled to recover his commission, a broker must show that he had procured a purchaser ready, able, and willing to purchase on the terms and conditions prescribed by the seller.

**2. Brokers and Factors § 1; Frauds, Statute of § 6a—**

A contract between a broker and the owner to negotiate a sale of land is not required to be in writing.

**3. Brokers and Factors § 6; Contracts § 3— If there is no agreement in regard to all essential terms, there is no contract.**

The seller agreed to sell on condition that payment of a stipulated portion of the purchase price be deferred upon terms to be worked out to afford him the best tax advantage. The broker procured a purchaser willing to pay the entire purchase price in cash or partly in cash with the balance secured by a second mortgage, or a smaller down payment with the balance secured by a first mortgage. The seller refused the offers, stating that he required the stipulated cash payment with the balance payable in ten yearly installments at six per cent interest, secured by a first mortgage. *Held:* Nonsuit was properly entered in the broker's action for commission, since if the terms of the sale were not definitely fixed there was no contract, while if the terms of the sale were fixed the broker did not procure a purchaser willing and able to comply with the terms as set forth by the seller.

APPEAL by defendant from *Mallard, J.,* June 1963 Session of CUMBERLAND, docketed in the Supreme Court as Case No. 600 and argued at the Fall Term 1963.

Plaintiff, a corporation engaged in the business of selling real estate, instituted this action to recover a commission. Defendant is the owner of a one-half interest in property in Fayetteville known as Big Farmers Warehouse and Drive-In Restaurant. On October 18, 1961 he and his cotenants, Blanche P. Barbour and Ann B. Davis, executed an "exclusive sales agency contract" whereby, for four months, plaintiff was granted the right to sell the property at the price of $235,000. In it they agreed to pay plaintiff a five percent commission if it procured a purchaser in accordance with the agreement even though they might be unable or unwilling to complete the sale. In addition, the contract contained this provision: "P. L. Campbell will accept no more than 29% of his half interest as down payment as a requirement of any sale."

On January 29, 1962 Barbour and Davis sold their one-half interest in the property to Sherrill Akins and A. R. Talley, Sr., purchasers procured by the plaintiff, and paid it a five percent commission on the gross purchase price of their interest. Plaintiff brought this action to recover an

identical five percent commission from defendant, alleging in its complaint that after it secured Akins and Talley as purchasers, ready, willing and able to purchase defendant's interest in said property according to the terms specified in the sales contract, defendant refused to sell to them. In his answer, the defendant admitted the execution of the sales agency contract but alleged that it was a condition to any sale of his interest that the remaining seventy-one percent of the purchase price be secured by a first mortgage on the property and paid in ten annual installments with interest at six percent. He denied that plaintiff ever produced a buyer willing to purchase in accordance with those terms and conditions.

Plaintiff offered evidence tending to establish the following facts:

When the sales agency contract was executed on October 18, 1961, defendant was uncertain as to how he wanted the unpaid balance of the purchase price arranged. For that reason, no provision with reference to the manner in which it should be paid or secured was included. Defendant's purpose was to minimize the tax impact of the sale and "he made it a condition prerequisite to the final completion of any sale of this property that it be done in a way that it would be to his best tax advantage . . ." Defendant and Paul H. Thompson, president of the plaintiff corporation, specifically agreed that "the balance would be worked out as an agreement, after defendant consulted with his accountant and attorney."

On November 17, 1961 plaintiff submitted a written offer, signed by Akins and Talley, to pay $117,500 for the Barbour-Davis interest in the property and, "up to 29% of $117,500 to Campbell," his balance to be paid "in installments as directed by Campbell with interest at 6% on such unpaid balance until fully paid." This offer was accompanied by a good faith deposit of $5,000 with plaintiff as escrow agent. They were then in a position to pay the entire purchase price of the property in cash, having obtained a commitment for a loan from the Scottish Bank to be secured by a first mortgage on the property. On November 20, 1961 defendant and his cotenants accepted this offer in writing "subject to: Good faith deposit increased to $35,000.00, (2) Sellers reserve the right to withdraw this acceptance in writing by noon November 23, 1961." On the morning of November 20th Akins and Talley deposited with Thompson checks totaling $35,000 in accordance with the stipulation in the acceptance; however, on the same day they retrieved the checks and destroyed them.

Thereafter, Mr. Thompson and other agents of the plaintiff, as well as Mr. James C. Davis who represented the Barbour-Davis interest in the property, had a number of conversations with defendant with reference

to the mode of paying and securing the seventy-one percent balance of his part of the purchase price. Thompson told defendant that "if the tax situation was such that it was to his advantage to work out an escrow arrangement, secondary financing, second mortgage, or whatever . . . they stood ready to pay in cash, to pay him in the form of his required down payment, or to do whatever his wishes were, within reason to close out this real estate contract." According to Thompson, he explored many areas, "but we could never get any definite approach." In November 1961 defendant told Davis that he would sell his interest in the property if twenty-nine percent of the purchase price were paid in cash and the balance of seventy-one percent secured by a first mortgage on the property and paid in ten annual installments with interest at six percent. Thompson testified that defendant first made this proposition to him in a letter dated January 31, 1962, seventeen days before the expiration of the contract.

In December, Mr. Davis took defendant one offer from Akins and Sherrill which provided that the balance of the purchase price would be secured by a second mortgage, and another which provided that the balance be held in a trust fund at the Scottish Bank. Defendant, after some study, declined both. On January 24, 1962, plaintiff, on behalf of Akins and Talley, submitted another written offer to purchase the property at the stipulated price proposing that $50,000 be paid in cash and the balance of $185,000 be paid in ten annual installments at six percent interest and secured by a first mortgage on the premises. Defendant declined this offer. After Akins and Talley purchased the Barbour-Davis interest in the warehouse, defendant offered to sell them his interest if they, wanted it. They told him they were not then interested in buying his half, and felt that the best thing to do "was to join together to work for the good of the business."

Defendant's evidence tended to show the following:

He informed Mr. Thompson on November 20th, at the time he signed his acceptance on the first offer to purchase, that he would accept the balance above the initial cash payment in ten equal payments at six percent interest. At that time he did not mention the security. On November 22nd defendant called Mr. Davis and told him to have the papers prepared for he was going to sell. On November 27th, Mr. Davis tendered him another contract of sale whereby Akins and Talley proposed to purchase the entire property by paying $151,575 in cash with the balance to be secured by a second mortgage on the premises and payable in ten equal annual installments with six percent interest. Defendant declined to consider a second mortgage. Thereafter, Davis brought him another proposed contract of sale whereby Akins and Talley agreed to pay the

sum of $117,500 to Barbour-Davis and $34,075 to defendant, his balance: to be paid in ten equal annual installments at six percent interest and secured by a certificate of deposit in the Scottish Bank with John Steadman, Jr., as trustee. Defendant also declined to accept this "escrow" arrangement. After receiving these last two proposals, defendant talked to Mr. Thompson and told him that he was ready to sell when they would give him a deed of trust to secure the balance which was to be paid in ten annual installments with interest at six percent. Up to that time no paper had been presented to him which provided for a sale upon his terms and Mr. Thompson never did say that he could provide "an agreement of that kind." Defendant was willing to sell at any time that they offered him a first deed of trust but no such offer was ever made. On January 31, 1962 defendant wrote plaintiff that until February 16, 1962 he would sell for $117,500, to be paid twenty-nine percent in cash upon delivery of the deed with the balance in ten annual installments at six percent interest and secured by a first mortgage.

The defendant's motions for nonsuit at the close of plaintiff's evidence and at the close of all the evidence were overruled.

By its verdict, the jury determined that defendant had breached the sales agency contract of October 18, 1961 and was indebted to the plaintiff in the sum of $5,875. From judgment entered on the verdict the defendant appealed.

*McCoy, Weaver, Wiggins & Cleveland by John E. Raper, Jr., for plaintiff appellee.*

*Williford, Person & Canady by Donald R. Canady for defendant appellant.*

SHARP, J. "It is established law in this jurisdiction that a real estate broker is not entitled to commissions or compensation unless he has found a prospect, ready, able and willing to purchase in accordance with conditions imposed in the broker's contract." *Sparks v. Purser,* 258 N.C. 55, 127 S.E. 2d 765. Therefore, for a broker to recover he must establish (1) a binding contract and (2) performance on his part. The plaintiff bases this action upon the agreement which the parties made on October 18, 1961. That agreement was not entirely in writing. The portion which related to the mode of paying the seventy-one percent of the purchase price was oral. However, a contract between a broker and a landowner to negotiate a sale of the latter's land is not required to be in writing. *Carver v. Britt,* 241 N.C. 538, 85 S.E. 2d 888.

Plaintiff concedes that no method for paying the balance of the purchase price above the cash down payment was fixed on October 18, 1961.

At that time the parties merely agreed that they would subsequently work out such terms, but it was expressly stipulated by defendant that, as "a condition prerequisite" to any sale, the manner of payment must be to his "best tax advantage." The defendant contends that he later fixed the terms for the payment of the seventy-one percent balance by requiring that it be secured by a first mortgage and paid in ten annual installments at six percent interest. If he did, it is clear from the evidence that plaintiff never secured a purchaser willing and able to purchase upon those terms. If he did not specify definite terms, the condition precedent to the formation of a binding contract was never fulfilled.

The condition that the method and manner of payment be subsequently worked out was not, as in *Carver v. Britt, supra,* a mere detail relating to the ultimate performance of an existing contract. Until such terms were specified by the defendant, after consultation with his attorney and his accountant, and accepted by the plaintiff, there was no valid and enforcible brokerage contract. "To constitute a valid contract the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms are not settled, there is no agreement." *Goeckel v. Stokely,* 236 N.C. 604, 73 S.E. 2d 618. "Consequently, the acceptance of a proposition to make a contract, the terms of which are to be subsequently fixed, does not constitute a binding obligation." 1 Elliott on Contracts, § 175; *Croom v. Lumber Co.,* 182 N.C. 217, 108 S.E. 735.

This case is analogous to that of *McCoy v. Trust Co.,* 204 N.C. 721, 169 S.E. 644 in which a real estate broker sued for a commission. She had procured a purchaser willing to purchase the land at defendant's price of $12,000. Plaintiff testified that defendant's agent told her "they were willing to accept $4,300 down, but would not state any terms; that they would be willing to give liberal terms, but would not state what the liberal terms were. He didn't know exactly what they would do, but would give terms. He didn't state exactly what they would do then." This Court said: "It is evident that, according to the plaintiff's testimony, she had no definite terms upon which to offer the farm for sale." The judgment of nonsuit was sustained.

Where one agrees to sell land for a certain price, "Terms: cash or contract," the broker has authority to sell only upon terms and conditions to be agreed upon and which are satisfactory and acceptable to the landowner. *White v. Turner,* 164 Kan. 659, 192 P. 2d 200. If the details of the terms are never given to the broker by the owner, he is precluded from producing a buyer, ready, able and willing to buy on the terms fixed by the principal. *Pugh v. Dollahan,* 49 N.M. 228, 160 P. 2d 951.

It cannot be seriously contended that a binding contract of sale was created by the defendant's conditional acceptance of the offer to purchase

dated November 17, 1961. The short answer to such a contention is that the checks totaling $35,000, deposited as earnest money by Akins and Talley with the plaintiff on November 20, 1961 in accordance with the requirement in defendant's acceptance, were withdrawn and destroyed on the same day. At that time, according to plaintiff, defendant still had not indicated how he wanted the balance paid. Whether Akins and Talley would have met these requirements when they became known, is a matter of conjecture.

After they took up their checks on November 20th, Akins and Talley did not pursue their offer of November 17th further. Two other offers to purchase were made in December. One proposed to secure the balance of the purchase price by a second mortgage; the other, by a trust fund or escrow account which apparently offered defendant no tax saving. It seems that Akins and Talley were at all times able and willing to pay the entire purchase price in cash, but an offer to purchase property for cash does not entitle the broker to his commission if the landowner has specified deferred payments. Annot., 18 A.L.R. 2d 376, 380. The final offer in January 1962 provided that the balance be secured by a first mortgage but called for a cash payment of only $50,000 which was to be divided between all the co-owners of the property. Defendant accepted none of these propositions.

In 12 Am. Jur. 2d, *Brokers* § 187, we find the following:

"Where the listing agreement fails to fix the terms for the sale or exchange of property, or specifies only part of the terms with the understanding that further details are subject to negotiation between the principal and the customer, the principal has been held free to terminate the negotiations without liability to the broker. Moreover, in such a case the broker may be denied compensation unless he produced a customer ready, able, and willing to buy on such terms as the principal may require, or as he accepts, or unless the principal and the customer reach a definitive oral or written agreement."

See also Restatement, Agency, 2d § 445, comment *d.*

In this case the plaintiff finds itself in this dilemma: If the terms of the sale were not finally fixed it had no binding contract; if they were, it never produced a purchaser willing and able to comply with those terms. It matters not whether the defendant changed his mind about selling the property, as plaintiff contends, or whether the impasse resulted because the lending institution would furnish Akins and Talley the money with which to purchase the property only if its loan were secured by a first mortgage on the warehouse while defendant would sell only if he could obtain a first mortgage on the same property securing the balance due

him on the purchase price. In either situation, under the evidence in this case, the defendant was entitled to his motion for nonsuit.

Reversed.